MICHELE ROCCI *vs.* MASSACHUSETTS ACCIDENT COMPANY.

Suffolk.    November 21, 22, 1916. — May 23, 1917.

Present: RUGG, C. J., LORING, DE COURCY, CROSBY, & CARROLL, JJ.

*Insurance,* Health. *Payment. Practice, Civil,* Exceptions, Judge's charge. *Words,* "Within the house."

It here was not disputed that in an action on a policy of health insurance, which contains a provision that the insurer "shall have the right and opportunity to examine the person of the insured . . . when and so often as it requires," a period of sickness for which the insured can recover indemnity must terminate on his sailing for a foreign country beyond the ocean.

In an action on a policy of health insurance one of the issues was whether a premium of $1 was paid by the plaintiff on the day that it was due. There was evidence that at about eight or nine o'clock in the morning of the day the premium was due the plaintiff, who was sick in bed, signed an application for a money order for $1 and gave $1 to his nurse and directed her to go to a post office station nearby and get a money order and send it to the insurer, that eight money orders were issued at that postal station on the day in question and that the second of them was for $1 and bore the number that was on the stub brought by the nurse to the plaintiff, that the secretary and treasurer of the insurer testified that the payment of the premium was received on the day after the day it was due but that there were no records in existence showing when it was received "because it was the invariable practice of the company in returning a premium which had been received, to return it on the day it was received." He also testified, however, that he usually left the office at 5 P. M., and that if the letter was delivered after that hour he would not see it until the next day and that he could not say that that was not the case in regard to this money order. The office of the insurer and the postal station both were in Boston. *Held,* that a finding was warranted that the premium was paid on the day that it was due.

In an action on a policy of health insurance the plaintiff sought to recover $50 a month for a period not exceeding twelve consecutive months "for the number of consecutive days, after the first four days, that the insured by reason of sickness [was] necessarily and continuously confined within the house, and [was] therein regularly visited by a legally qualified physician." The presiding judge refused to rule "that, if the plaintiff left his house to go to his sister's home, or elsewhere, to be more quiet, get more care, and to better his living conditions, even if advised to do so by his physician, he could not be said to be necessarily and continuously confined within the house within the meaning

of the policy from the time he first left it for such purpose." It appeared that in each of the removals of the plaintiff he was carried from his bed to a carriage, or in one case to an ambulance, and on his arrival was put to bed. By the charge of the judge the plaintiff was allowed to recover if he proved "a substitute" for actual continuous confinement to the house "which the jury might say was an equivalent." *Held*, that by the true construction of the clause of the policy what was required was a certain degree of sickness and not the literal fact of staying in the house under all circumstances and that, where there was an exigency for a removal from one house to another and the insured was removed in the manner that the plaintiff was, there was no break in the continuity of confinement, and that, whether the fact of removal showed that the plaintiff was not sick to the degree required and whether there was an exigency which made it necessary that he should be carried to the other house although he was sick to the required extent, were questions for the jury, and therefore that the ruling was refused rightly.

In the same case it also was *held* that there was evidence of an exigency, arising from the physical and financial condition of the insured in the case of other removals of the insured besides those mentioned in the ruling quoted above.

In the same case the defendant took an exception to the judge's charge on the ground that the judge, in instructing the jury that the plaintiff must prove that there was an exigency for each and all of the removals, had failed to define the word "exigency," but it appeared that there was nothing in any of the defendant's requests for instructions asking for a definition of exigency, and it was *held* that the exception must be overruled, because, if the defendant had wanted the judge to go further in his instruction to the jury and to define what "exigency" meant in this connection, it ought to have asked him to do so.

CONTRACT on a policy of health and accident insurance, which originally was issued by the Protective Disability Insurance Company, and the performance of which was assumed by the Bay State Casualty Company and later by the defendant. Writ in the Municipal Court of the City of Boston dated May 10, 1911.

On appeal to the Superior Court the case first was tried before *Bell*, J., who submitted two issues to the jury, and under St. 1913, c. 716, § 2, reported the case on the answers of the jury without a general verdict for such judgment as might be ordered by this court. This court, in a decision reported in 222 Mass. 336, ordered a new trial of the case except upon the first issue, which related to an alleged release and on the trial of which there was no error.

The new trial was before *Hall*, J. The material evidence is described in the opinion, where the portion of the policy sued .upon is quoted and described. The other provisions of the policy there referred to as material to the discussion of the case were as follows:

"Benefit No. 7. (10) Non-Confining Sickness Indemnity: —

If during convalescence immediately following confinement within the house, or by reason of a non-confining sickness, the Insured shall be wholly and continuously disabled from performing every duty pertaining to any business or occupation, and is regularly attended by a legally qualified physician (during the time for which claim is made), the Company liability shall be two weeks and one-half of the sickness indemnity that would otherwise be allowed under Benefit No. 9 of this Policy."

"B. The Company shall have the right and opportunity to examine the person of the Insured in event of injury or sickness, when and so often as it requires; and, in case of death, it shall also have the right and opportunity to make an autopsy on the body of the Insured. Refusal to permit such examination or autopsy shall invalidate any and all claims hereunder."

The defendant asked the judge to make the following rulings:

"2. That the time for which the plaintiff was entitled to recover under the terms of the policy, was for the number of consecutive days after the first four days and not exceeding twelve months that the plaintiff by reason of sickness, was necessarily and continuously confined within the house and therein regularly visited by a legally qualified physician, and that if the plaintiff left his house to go to his sister's home, or elsewhere, to be more quiet, get more care, and to better his living conditions, even if advised so to do by his physician, he could not be said to be necessarily and continuously confined within the house within the meaning of the policy from the time he first left it for such purpose."

"4. That if the jury find that the plaintiff left his own home, in which he was first confined, to go to his sister's home in Roxbury, that the term for which the defendant was liable was thereby ended at the date he left his home.

"5. That there is no sufficient evidence in the case to warrant a finding of any exigency that would legally justify the plaintiff in leaving his home in which he was first confined and preserve the defendant's liability."

"7. That there is no sufficient evidence in the case to warrant the jury in finding that the premium due upon December 1, [1909] was paid or tendered upon that day.

"8. That if the jury could properly find that he was necessarily and continuously confined within the house from the commence-

ment of his illness and during the time he was in his own home and at his sister's home, the evidence does not warrant a finding for the plaintiff for any time after he left his sister's home.

"9. That if the jury could properly find that he was necessarily and continuously confined within the house from the commencement of his illness to and including the time he was in the City Hospital, the evidence does not warrant a finding for the plaintiff for any time after he left the City Hospital.

"10. That upon the proper construction of the policy held by the plaintiff, the promise of the company does not cover removal from the house of the insured to and confinement and treatment in a hospital, even if such removal was advised by the insured's physician.

"11. That any exigency that would justify the plaintiff, after he was taken ill in his own house, in removing therefrom to the home of another or to any institution, and preserve the liability of the company, must be of a nature to deprive him of any volition in the removal.

"12. That, if the jury find that the plaintiff removed from his own house where he was first confined by sickness to his sister's home, and from thence to a hospital, and thence returned to his house where the sickness commenced, and after a period of confinement in his house went therefrom to his brother's house in Medford, and after a period of confinement there again returned to his own house, and after another period again went therefrom to a hospital, and again returned home, and after another period went to Italy, it cannot be said that within the meaning of the policy he was necessarily and continuously confined within the house and therein treated by a physician for a longer term than had elapsed when he first left his house and went to his sister's house."

The judge refused to make any of these rulings.

The judge "ruled that, if the plaintiff failed to pay or tender to the defendant upon December 1 the monthly premium due upon that date, the policy would thereby lapse and there would be no liability beyond said date; and that it was not sufficient that the plaintiff should have mailed, or caused to be mailed, upon December 1, a money order for the premium due that date, but unless such money order was actually received by the defendant upon

December 1, the policy would lapse, and no recovery could be had beyond that date."

The material portions of the judge's charge are described in the opinion.

The jury returned a verdict for the plaintiff, in the sum of $540.07; and the defendant alleged exceptions.

*W. C. Cogswell,* for the defendant.

*W. A. Chandler, (B. R. Wilson* with him,) for the plaintiff.

LORING, J. This case was before this court in 222 Mass. 336. To understand the arguments now made a short statement of the facts of the case is necessary.

The action is brought to recover a sickness indemnity of $50 a month for (substantially) nine months.

The policy on which the action was brought was a policy by which the insurer agreed to make "Accident Provisions" and "Sickness Provisions." The part of the policy as to "Sickness Provisions" was in these words: "(8) In the event of loss of time through sickness, complete, continuous and total, and such as shall wholly disable and prevent the Insured from the date of the beginning of sickness from performing every duty pertaining to any business or occupation (and as herein and hereon provided) the Company will pay one of the following Benefits, to wit: — Benefit No. 6. (9) Sickness Indemnity: — At the rate of Fifty Dollars ($50.00) per month (for a period not exceeding twelve consecutive months), for the number of consecutive days, after the first four days, that the Insured by reason of sickness is necessarily and continuously confined within the house, and is therein regularly visited by a legally qualified physician." The other provisions of the policy material to the discussion of the case are set forth in the statement of the case.

In the case at bar it appeared that the plaintiff was taken sick on October 9, 1909, and on that day went to bed at his own house in Garden Court Street in Boston. At that time it was thought that he was suffering from tuberculosis, but it was finally determined that he had "an abscess of the lung and chronic bronchitis." His sickness may be said to have had nine periods. During the first period he was at his own house. This period lasted two weeks. During the second period he was at the house of his sister in Schuyler Street in the Roxbury district of Boston. He went there on the

advice of his physician, who testified that "he [the plaintiff] went to Schuyler Street because he advised the plaintiff to go to a place that was more quiet, with better sanitary conditions; that his own home was cold and noisy; that Schuyler Street was quite warm, and his sister, where he was going, in good financial condition." This period lasted two weeks. This physician testified that during this period the plaintiff "grew progressively worse." During the third period the plaintiff was at the City Hospital. His physician testified that "he advised him to go to the City Hospital for further observation and treatment" and "that in his opinion it was necessary for a man in his condition to go from such a place as he was living in, and that it would be dangerous to leave him stay there." He was at the City Hospital for three weeks. During the fourth period the plaintiff was at the Elm Hill Hospital, Roxbury. He was there for three weeks. He then returned to his own house "because his funds ran out and he couldn't stay there [at the Elm Hill Hospital] any longer." During the fifth period he was at his own house. This period lasted for three weeks. During the sixth period he was at his brother's house at Medford and this period lasted two weeks. He then returned to his own house and this, being the seventh period, lasted about a month. During the eighth period he was at the Mattapan Open Air Hospital. This period lasted four months. From there (with a stop of "a few days" at his own house on the way) he was carried to a steamer bound for Italy. He was immediately put to bed and he stayed in bed throughout the voyage. This was on July 24, 1910. He went to Italy on the advice of his physician. The physician testified that he told the plaintiff that proper treatment required his going to a warm equable climate and that it was essential for him to go to Italy.

It appeared that when he first was taken sick the plaintiff went to bed and that he remained in bed during the whole of the nine months in question with the exception of the four months when he was at the Mattapan Open Air Hospital. During this period there was evidence that he was in bed "most all the time" but that "once in a while [he] sat up; that he didn't go out." It also appeared that when he went at the end of the first period from his own house to his sister's he was carried from his bed to a carriage and was carried from the carriage and put to bed in his sister's

house.  And further it appeared that this was the fact each time that he went from place to place with the single exception that when he went to the Mattapan Open Air Hospital an ambulance was used in place of a carriage.

The presiding judge ruled that the plaintiff could not recover after he took ship for Italy.  This was right, if for no other reason, because by the terms of the policy the company had to have "the right and opportunity to examine the person of the Insured . . . when and so often as it requires."

In his charge to the jury the judge read to them that part of the opinion of the court in 222 Mass. 336, which begins with the first whole paragraph on page 343 and ends with the last line of page 344.  He then told them: "that it was for them to say, upon the evidence, whether there was any exigency that warranted the plaintiff in making the various removals the evidence showed he made, and when such exigency commenced, and when it ended."

1. There is a preliminary question as to the payment of the premium due on December 1, 1909.  It is the defendant's contention that there was no evidence that it was paid on that day.

There was evidence that on the morning of that day the plaintiff who was then sick in bed signed an application for a money order for $1 (the amount of the premium) gave $1 to his nurse and directed her to go to the Grove Hall post office station get a money order and send it to the company which had insured him.  We say the company which had insured him because the defendant was not the company that insured the plaintiff; its liability came from a contract of reinsurance.  This was about eight or nine o'clock in the morning.  It further appeared in evidence that eight money orders were issued at that station on the day in question (December 1) and that the second of the eight was for $1 and corresponded in its number with the number on the stub which the nurse brought to the plaintiff for the money order for $1 which she was directed to get.  Further one Harding testified that at the time he was secretary and treasurer of the company in question; that there were no records in existence showing when payment was received "but that it was received upon December 2."  He testified that it was received upon December 2 "because it was the invariable practice of the company in returning a premium which had been received, to return it on the day it was received."  In addi-

tion he said that he usually left the office about 5 P. M. and if the letter was delivered after 5 P. M. he would not see it until the next day and he could not say that that was not the case with respect to this money order. There was evidence that the office of this company was in Boston. We are of opinion that this evidence warranted a finding that the premium due on December 1 was paid on that day and the seventh request asked for by the defendant was refused rightly.

2. The defendant's first contention on the main case is that his second request for instructions should have been given.

In support of that contention it has argued that to entitle himself to the "sickness indemnity" he sought to recover it was necessary for the plaintiff to prove that he was actually confined to the house during the nine months in question while under the judge's charge the plaintiff was allowed to recover if he proved "a substitute therefor which the jury might say was an equivalent." Later on in his argument the defendant conceded that if the plaintiff had been compelled to remove by reason of fire, by the termination of his tenancy, by order of the board of health or if he was removed by superior force the actual continuity of confinement would not have been broken within the meaning of the provision for continuous confinement within the house. In the cases covered by the concession the continuity of confinement (within the meaning of the clause of the policy here in question) would not be broken because by the true construction of it the clause is a description of the degree of sickness which must exist to entitle the insured to the "sickness indemnity" in question. There may be said to be three degrees of sickness. The first degree is when the patient is confined to his bed. The second degree is when he is not confined to his bed but is confined to the house. And the third degree is when he is too sick to work but is not confined to the house. By the true construction of it the clause of the policy here in question ("that the insured by reason of sickness is necessarily and continuously confined within the house") is a requirement that the second of these three degrees of sickness should in fact exist. There is no break in the continuity of the insured's sickness of the required degree in the cases covered by the defendant's concession, because by the true construction of this clause of the policy what is required is a degree of sickness, not the literal fact

of staying in the house under all circumstances. For the same reason there is no break in the continuity of confinement "within the house" in a case where there is an exigency for a removal from one house to another and the insured is removed in the way in which the plaintiff was removed in the case at bar. Ordinarily a person confined to the house by sickness is confined to one house. But if an exigency arises one confined to the house by sickness (and for the matter of that one confined by sickness to his bed) can be carried to another house. Where a person confined to his bed or to the house by sickness is carried to another house (as the plaintiff was carried in the case at bar) it is a question for the jury whether the fact that he was carried to the other house showed that he was not sick to the degree described on the one hand or on the other hand whether there was an exigency which made it necessary that he should be carried to the other house though he was sick to the required extent. The exception taken to the refusal to give the second ruling asked for must be overruled.

3. What has been said disposes of the defendant's exception to the admission of the testimony of the physicians (that the plaintiff's condition required him to be removed) and to the plaintiff's own testimony that he was ordered by his physician to do so.

4. The defendant's next contention is that the twelfth request should have been given.

The evidence disclosed specific exigency for each of the first three removals (that is to say for all the removals up to and including his removal from the Elm Hill Hospital to his own home) and for the last two (that is to his own home for a few days and then to the steamer bound for Italy). The exigency which sent him home from the Elm Hill Hospital was because his funds "ran out." No specific exigency was testified to for the other two removals, namely, his own house to his brother's and from his brother's to the Mattapan Open Air Hospital. But the general evidence of his physical and financial condition warranted a finding that there was an exigency for these two removals.

5. The defendant's last contention is that its exception to the judge's charge must be sustained. In support of this contention he argues that the judge did not define to the jury what he meant by the word "exigency" in connection with the removals which the plaintiff made. In telling the jury that the plaintiff must

prove that there was an exigency for each and all of the removals which he made the judge was right. If the defendant wished to have the judge go further and define what exigency meant in this connection it ought to have asked him to do so. All that it did was to take an exception to this part of the charge and to make the requests for rulings made by it. There was nothing in these requests asking for a definition of exigency. It follows that the exception to the charge must be overruled.

*Exceptions overruled.*